No. 5715.

JORDAN SMITH *v.* THE STATE.

1. PRACTICE—SPECIAL JUDGE.—Three modes only are prescribed by statute for the election, selection or appointment of a special judge. 1. If the regular judge fails to appear at the appointed time and place for holding his court, an election of a special judge for the term shall be held in accordance with the provisions of articles 1094 to 1100 of the Revised Statutes. 2. If the regular judge is, from any cause, disqualified to try a case, the parties thereto may select a special judge to try the case by agreement. 3. If the parties fail to agree, the district judge shall certify the fact to the governor, who shall appoint a special judge to try the case. In either event, it is required that the person elected, selected or appointed to serve as special judge shall, before entering upon his duties, take the oath of office required by the Constitution; and the manner of his selection or appointment as special judge, together with the reason therefor, and the fact that the oath of office was administered to him, "shall be entered upon the minutes of the court as part of the record in the cause;" and the same must appear in the transcript on appeal.

2. SAME—CASES DISTINGUISHED.—With respect to the selection of the special judge to try this case, the entry in the transcript reads as follows: "Hon. J. M. Maxcy was selected by the State and defendant, and was sworn to try the case of The State of Texas v. Jordan Smith, No. 2668." *Held*, indefinite and insufficient, in that it does not show the administration to the special judge of the constitutional oath. Note the opinion for the distinction between this and Early's case, 9 Texas Ct. App., 484.

3. THEFT—EVIDENCE—VARIANCE.—THE INDICTMENT in this case charges the theft of a "beef, an animal of the cattle kind." The proof shows that the alleged stolen animal was a cow. *Held*, that the term "cow" is embraced in the term "beef," and that there is no variance between the allegation and the proof.

4. SAME—CHARGE OF THE COURT.—Purchase of the animal was the defense relied upon by the defendant in this case, and it was an issue raised by the evidence. It was, therefore, the duty of the trial court, however improbable the evidence supporting the issue may have appeared, to submit the issue in charge to the jury, and the failure to do so was material error.

APPEAL from the District Court of Walker. Tried below before J. M. Maxcy, Esq., Special Judge.

The conviction in this case was for the theft of a beef, the property of James Spiller, and the penalty assessed was a term of two years in the penitentiary.

James Spiller was the first witness for the State. He testified that, in January or February, 1882, he missed his certain red-roan four year old cow from her range. About the same time he received information that the defendant had recently killed a beef. He then got his neighbor, Mr. Oliphant, and his two sons, Tom and Bailey, and a negro named Bob Taylor, to go with him to defendant's house to see what discoveries he could make. He sent Tom Oliphant to get Mr. J. G. Johnson to meet them at defendant's house. Witness, Mr. Oliphant, Baily Oliphant and the negro reached the defendant's house a little in advance of Tom Oliphant and Mr. Johnson. They did not find defendant at home, but saw him at a distance from the house. They sent for him, and he and Jim O'Bryan came together to the house. Witness then told defendant that he had come in search of his cow, which he described. Defendant replied that he killed a beef a day or two before, but that it was a red and white "pided" beef that he got from Charley Bowen. He said further that he paid Bowen for the beef with money that he got from Doctor Thompson. Witness then asked defendant where the hide of the animal he killed was. He replied that he sent it to town by Jim O'Bryan. O'Bryan, upon being questioned, denied that he ever took a hide to town for defendant. Defendant then said that he sent the hide to town by Bob Handy, and, on being pressed, he corrected himself again, and said that the hide was taken to town for him by a convict who went to town in Mr. Johnson's wagon.

Witness then told defendant that it was his purpose to search the place for the beef. Defendant asked him if he had a search warrant. He replied that he had not, but that Mr. Oliphant, who was a justice of the peace, was present, and could very readily issue one. The witness's party then went to the defendant's smoke house, the door of which they found locked. Being told to produce the key, the defendant went into his house ostensibly to get it, but remained so long that witness ordered him to return and open the door, as he and his party were determined to get into the smoke house. Defendant reluctantly produced the key and the party entered the smoke house, in which, at the point expected by witness, they found a barrel of fresh beef. The parties with the witness at that time were Mr. Oliphant, Tom and Bailey Oliphant, Mr. Johnson and the negro Bob Taylor. Finding nothing but the barrel of beef in the smoke house, the party went out to look for the hide and the refuse portions of the animal slaughtered. On getting a few yards distant from

the smoke house Tom Oliphant remarked that he saw a hide of some kind hanging up in the smoke house loft. The party then went back and found that the defendant's wife had relocked the smoke house door. She refused to produce the key until required to do so by defendant. The party then re-entered the smoke house and found two pieces of hide in the loft, which they took outside and spread on the ground side by side. It was discovered that a strip had been removed from the hide. The strip, if the hide belonged to the witness's animal, would have removed the brand, the brand being on the hip, and the strip being taken from that part of the hide. The ears were also missing from the hide. The hide was of the exact color of the hide of the witness's missing animal. Witness asked the defendant why the hide had been split. He replied that Johnson's wagoner split it to get a whip lash. Being further questioned about the missing strip, the defendant said that some person, not remembered by witness, cut the strip out to make "neck straps" with. Witness then asked defendant for the head of the slaughtered animal. He said that it would be found in the yard. An unsuccessful search of the yard was made, and the party went to the field, passing over a place where the unusual appearance of the grass attracted Tom Oliphant's attention. Returning to that place Tom Oliphant pulled up some of the grass, which, it was discovered, had no roots. The place was then dug into, and the feet and head were found. The head and horns and feet, in shape, color and size, resembled the head, horns and feet of witness's missing cow.

Mr. Johnson then asked defendant if the discoveries made did not look suspicious. He replied that it did, but that he did not know who buried the parts unless some of the women did. The place where the cow was slaughtered was then found near an old plum orchard, about one hundred and fifty yards distant from defendant's house. That spot had been covered by some one with moss and plum bushes. The witness and the parties with him then held a council, and Mr. Johnson, who owned the place where defendant was living, told defendant that he did not want cow thieves about him, and that he, defendant, could not stay any longer on the place. It was then determined to postpone the arrest of the defendant for a day or two upon the impression that he would leave the neighborhood, and by that means relieve the neighbors of his presence. As expected, the defendant left at once, and witness did not see him again for several years, when he was brought back by the sheriff and

placed in custody. The hide, horns, head and feet found on defendant's premises resembled closely the remains of witness's missing cow, and witness was satisfied, but of course could not swear with absolute certainty, that they were the remains of the identical cow he lost. The cow described by witness belonged to him, was on the range in his possession, and was taken from that range without the knowledge or consent of witness.

Cross examined, the witness stated that, in testifying that, in his opinion, the remains described were the remains of his animal, he based his opinion upon the color, size, age and sex of the slaughtered animal, as disclosed by the hide and the shape of the head and horns. Witness could not remember when he last saw his cow before he found the remains on defendant's place, but his animal was very gentle, and came up to the house very often. She would have been four years old in the spring of her disappearance—1882. Witness owned four red roan cattle on the range at that time, one of them being the animal in question, another an aged cow, and two of them heifers. On a former trial of this case witness testified that he had two red roan cattle at the time mentioned, but he went back before the jury of his own accord, corrected that statement, and testified that he had four head. Witness did not now remember that he went before the first grand jury that met after the alleged theft, but knew that he had been before several grand juries since the theft of this cow. Bob Taylor, the negro who was with witness and his searching party, was a convict. Green Whitehead was well acquainted with the witness's cattle in 1881 and 1882. Green Whitehead never, at any time, told witness that he had seen one of witness's red roan cows dead in the bottom. Witness had never before heard of one of his red roan cows being found dead in the bottom. On one occasion, just before the alleged theft, the defendant, in passing witness's house, told witness that he was going to get some cattle from Bowen. On his return from that trip he told witness that he could not get Bowen's cattle, as they were all under mortgage to Eastham.

James G. Johnson was the next witness for the State. He testified, in substance, that Spiller sent for him to meet him at defendant's house on the eleventh day of January, 1882 (as shown by witness's memorandum book), to assist in the search of defendant's premises for fresh beef and the remains of a slaughtered animal. The smoke house door was open when witness reached defendant's house. From this point the witness

testified substantially as Spiller did as to what occurred on the defendant's premises, and as to what was discovered and how it was discovered, and as to defendant's statements concerning the matter. He testified, in addition, that, a short time before the search of defendant's house, defendant came to him to borrow money with which to buy several head of cattle, but witness did not let him have the money.

Bailey Oliphant, for the State, corroborated the witness Spiller in detail, and testified, in addition, that when the defendant claimed to have purchased the animal slaughtered from Bowen, he exhibited a bill of sale to support his statement. That bill of sale was not signed by Bowen, but by one C. E. Ella, and transferred an animal wholly different in color from the color of the hide found in the smoke house. Defendant's attention was called to the discrepancy between the description given in the bill of sale and the color of the hide found, as stated.

Doctor Thomasson testified, for the State, that, about November 17, 1881, he loaned the defendant money for the purpose of purchasing several head of cattle from Charley Bowen. Defendant paid the loan on January 1, 1882, and told witness that he could not and did not buy Bowen's cattle, because they were under mortgage to Eastham. The defense admitted that defendant left the country immediately after the search of his premises in 1882, and that he was brought back by the sheriff of Walker county.

The State proved the venue, and closed.

Green Whitehead, the first witness for the defense, testified, in substance, that he lived on Spiller's place in 1881 and 1882, and attended to and knew Spiller's cattle. In January, 1882, Mr. Spiller owned three red roan cattle over three years old, one being an aged cow, which was afterward sold. Spiller still had one of the said animals, and one of them disappeared, and was the animal which Mr. Spiller claimed was killed by defendant. This witness, designating no particular time, said that he saw the dead body of a red roan cow in the bottom on the range of Spiller's cattle. That cow had been drowned. Witness then thought, and told a party with him that he thought the dead body was one of Spiller's red roan cows. That party replied that he did not think so. The witness knew the cattle belonging to Charley Bowen at that time, and on which Mr. Eastham had a mortgage. Among them was a red roan cow, very much like Spiller's missing cow. Witness afterward gathered the Bowen

cattle covered by Eastham's mortgage and delivered them to Mr. Eastham's agent. The red roan cow belonging to Bowen was not among those so gathered and delivered by witness to Eastham's agent. Witness was present at Spiller's house when defendant passed it returning to his home from Bowen's. He heard defendant tell Spiller that he did not get the Bowen cattle because they were under mortgage to Eastham, but witness understood him to also say that he was going back to see Bowen about the cattle. The witness knew that Charley Bowen left the country shortly afterward. Witness did not personally know why Bowen left. On his cross examination the witness said that he never told Mr. Spiller that he saw the dead body of a red roan cow which he thought belonged to him, Spiller. Witness did not make a close examination of the dead cow, and did not know absolutely that it was Spiller's cow, but he thought so then. He did not see nor examine for brands on the dead body. The cow had been dead several days when witness saw it, and was about half devoured by vultures. The witness did not know what became of the Bowen red roan cow.

James O'Bryan testified, for the defense, that, at the time of the slaughter of the alleged stolen animal, the witness and his wife, Bob Taylor and the defendant's mother-in-law lived with the defendant and his wife, on the Randall place, then in charge of Mr. Johnson. The cow slaughtered was driven up with some oxen and other cattle by Bob Taylor. Witness was then confined to the house with the measles, and was not present at the killing. Defendant claimed the animal as one bought by him from Charley Bowen, and witness knew that, some time before the slaughter of the animal, defendant got some money for a bale of cotton he sold. About that time witness heard defendant and Charley Bowen talking about a proposed purchase by the defendant of a beef or beeves from Bowen. The feet of the slaughtered animal were left on the gallery for several days, and until witness heard the defendant's mother-in-law declare that they were becoming offensive, and she directed Bob Taylor to take them and bury them to prevent them from impregnating the air with stench. Bob Taylor took them off as directed, but witness did not know what he did with them. Witness did not see defendant when Taylor brought the beef to the house. Taylor, when he drove the beef up, was riding defendant's horse. Both witness and Taylor, who were being "furnished" by defendant, ate some of the beef. Witness did not know who killed the beef.

Eliza O'Bryan, the wife of James O'Bryan, testified, for the defense, that a few days after the slaughter of the beef at defendant's house, she heard defendant's mother-in-law tell Bob Taylor to take the feet of the beef off and bury them, and she saw Taylor leave the house with them, taking a spade with him. Defendant claimed that he bought the animal from Charley Bowen.

Davis Thompson, the brother-in-law of the defendant, testified, for the defense, that, a short time before the alleged slaughter of the beef on defendant's premises, he went with defendant to the house of Charley Bowen, and saw Bowen point out to the defendant three certain cattle, one being a red spotted cow, one a male, and the other a reddish roan heifer. On the following Monday, the witness, at defendant's house, saw the defendant pay Bowen some money for the cattle previously pointed out. Witness knew that Ella Bowen, the step-daughter of Charley Bowen, could write.

Mattie Smith, the defendant's wife, testified, in his behalf, that about a week before the slaughter of the beef involved in this prosecution, she was present and witnessed the transaction in which the defendant bought the slaughtered animal and some other animals from Charley Bowen. She saw Bowen point the cattle out to defendant, and she saw the defendant pay Bowen the purchase money for the same. The animal killed was one of the cattle so bought by defendant. The hide found in the smoke house by Spiller and others came off that animal. Bob Taylor drove the said animal to the house and killed it. Afterwards the feet were dragged to the house by the dogs. Witness's mother told Taylor to take them off and bury them, to keep them from smelling. Taylor took the head and feet and a spade, and went off towards the place where they were afterwards found.

Benton Randolph, of the law firm of Abercrombie & Randolph, testified, for the defense, that, two or three years ago, his firm was employed to represent the defendant in this case. At that time defendant gave the said firm a bill of sale, in the handwriting of Doctor J. A. Thomasson, which purported to convey certain cattle from Charley Bowen to defendant. That bill of sale was burned, with other legal papers belonging to the firm, in January, 1887. According to the recollection of the witness, that bill of sale gave no description of the cattle conveyed, nor was it signed by Bowen, but purported to have been signed by some one else, whom witness understood to be a girl. Witness did not know that the bill of sale referred to by him was the

same bill of sale exhibited by defendant to the State witness Oliphant.

Judge Abercrombie testified that, according to his recollection, the bill of sale described by Captain Randolph purported to convey three head of cattle, described only by marks and brands, and that it was signed "Ella," and he thought "C. E. Ella."

The motion for new trial raised the questions discussed in the opinion.

*Abercrombie & Randolph,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.    This case appears to have been tried below by a special judge.    It is well settled that in such cases the record upon appeal must show the reasons for the selection of, and the manner in which he became special judge. (Brinkley v. Hawkins, 48 Texas, 225; McMurray v. The State, 9 Texas Ct. App., 207; Snow v. The State, 11 Texas Ct. App., 99; Perry v. The State, 14 Texas Ct. App., 166; Wilson v. The State, Id., 205, and Harris v. The State, Id., 676.)    Three modes are provided by statute for the selection and appointment of special judges:    First.    When the regular judge fails to appear at the appointed time, etc., for holding his court, in which event an election of a special judge for the term shall be held in accordance with the provisions of articles 1094 to 1100 of the Revised Statutes, inclusive.    Second. · When the regular judge is from any cause disqualified to try a case, the parties thereto may select a special judge to try the same by agreement.    (Code Crim. Proc., art. 570.)    And third, where the parties fail to agree, the district judge certifies the facts to, and the Governor appoints a special judge to try the case.    (Code Crim. Proc., art. 571.)    If selected in either of these three modes he must, before entering upon his duties as special judge, take the oath of office as required by the Constitution of the State; "and his selection by the parties, or appointment by the Governor, as the case may be, and the fact that the oath of office was administered to him, shall be entered upon the minutes of the court as part of the record of the cause," etc.    (Code Crim. Proc., art. 572.)

In the case before us the only entry with regard to the special judge is the following:    "Tuesday, September 20, 1887, Hon. J. M. Maxey was selected by the State and defendant, and was

sworn as a special judge to try the case of The State of Texas v. Jordan Smith, No. 2668." This entry the clerk certifies to be found in his minutes, but it is entirely detached from, and disconnected with any of the other proceedings in the case. Whether it is a sufficient compliance with the statute is the question presented. No reason for the appointment, that is, that the district judge was disqualified, is stated; no agreement in writing to the selection of the special judge is set forth; no statement that he took the oath of office required by the Constitution is made, except inferentially.

In Thompson's case, 9 Texas Court of Appeals, 649, it was held that an agreement of counsel to appoint a special judge to try a cause should be perpetuated in writing, and such writing filed among the papers and made a part of the record.

In Early's case, 9 Texas Court of Appeals, 484, it was said: "In the absence of anything appearing to the contrary, we will presume that the regular judge was disqualified from some one of the causes of disqualification enumerated, and that on that account the special judge was selected for the trial, and that the proper oath was administered to him as such judge." But in that case the record affirmatively stated that the parties in open court agreed upon the special judge, and, further, that "he was duly sworn according to law." In the case we are considering, the statement is that "he was sworn as a special judge." This is certainly most indefinite. It does not inform us what oath was taken. If he did not take the Constitutional oath of office, he was not "sworn according to law." We are of opinion that the entry of the selection of the special judge is too uncertain in terms to show even a substantial compliance with the law. (See Willson's Crim. Forms, Nos. 644, 645, p. 299.)

In disposing of this case upon appeal, we are requested by the Assistant Attorney General, in view of another trial, to pass upon two other questions plainly arising upon the record. The first is as to whether there is a variance between the allegations in the indictment and the proofs with regard to the description of the animal charged to have been stolen. In the indictment the animal is described as "one beef, an animal of the cattle kind." In the evidence the animal is proved to have been a cow. The question is whether the word "beef" embraces "a cow." We are of opinion that it does, and that there is no variance. In Duval v. The State, 8 Texas Court of Appeals, 370, it was held that "one beef cattle" is a sufficient description of a

stolen bovine in an indictment for theft.    Mr. Webster says the word "beef" includes the bull, cow and ox, in their full grown state; and this, we think, is the common acceptation of the word.

Upon the other matter, the charge of the court is radically deficient.    The only defense relied upon was a purchase of the alleged stolen animal.    This may, in the estimation of the learned trial judge, have been a pure and manifest fabrication; nevertheless, as it was the issue made by evidence and a question the truth of which it was the province of the jury alone to pass upon, it was his duty to submit it to them under appropriate instructions in the charge.    (White v. The State, 18 Texas Ct. App., 57; Irvine v. The State, 20 Texas Ct. App., 13; Wimberly v. The State, 22 Texas Ct. App., 506; Bond v. The State, 23 Texas Ct. App., 180; Shuler v. The State, Id., 182.)

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered November 12, 1887.